FILED

NOV 2 4 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARSHA LYNNE COLEMAN-ADEBAYO )
6017 Cairn Terrace
Bethesda, MD 20817

Plaintiff,

v.

CASE NUMBER 1:03CV02428

JUDGE: Colleen Kollar-Kotelly

DECK TYPE: TRO/Preliminary Injunction

DATE STAMP: 11/24/2003

JURY ACTION

MICHAEL O. LEAVITT, Administrator )
United States Environmental Protection Agency )
1200 Pennsylvania Avenue, N.W. )
Washington, DC 20460 )
)
Defendant. )
)

COMPLAINT AND DEMAND FOR JURY TRIAL

INTRODUCTION

1. This is a civil action alleging the denial of reasonable accommodation for plaintiff's disability and retaliation for plaintiff's actions in bringing administrative and judicial proceedings for race, color, sex and disability discrimination. Plaintiff seeks injunctive relief, compensatory damages, and attorneys' fees and other costs of the action. Plaintiff requests a trial by jury.

JURISDICTION AND VENUE

2. Jurisdiction is based on 28 U.S.C. 1331 (federal question jurisdiction), 28 U.S.C. 1343(4) (jurisdiction over suits involving congressional acts protecting civil rights), 42 U.S.C. 2000e-16(c) (jurisdiction over suits involving non-discrimination in federal government employment), Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5(f)(3), and the Federal Rehabilitation Act of 1973, 29 U.S.C. 701.

3. During 1999, 2000 and 2001, plaintiff made five formal complaints to the Office of Civil

Rights of the Environmental Protection Agency ("EPA"). EPA Case Nos. 1999-0115HQ, 2000-0007HQ, 2000-0081HQ, 2000-0085HQ, 2001-0014HQ.

4. This Court has jurisdiction because 180 days have passed since the formal complaints were filed. *See* 42 U.S.C. 2000e-16(c).

5. Venue lies in this Court pursuant to 28 U.S.C. 1391(e) because the events giving rise to plaintiff's claims occurred in the District of Columbia.

PARTIES

Plaintiff

6. Marsha Lynne Coleman-Adebayo is a black African-American female citizen of the United States and resident of the State of Maryland. She is a grade GS-15 employed by EPA.

Defendant

7. Michael O. Leavitt is the Administrator of EPA.

FACTS

8. Plaintiff holds a doctorate degree in political science with a specialization in African and international affairs from the Massachusetts Institute of Technology. She has spent the majority of her professional career working in the areas of environmental protection, international affairs, and sustainable economic development with regard to Africa.

9. Plaintiff is a black African-American female and suffers from multiple sclerosis, hypertension and glaucoma. Plaintiffs' hypertension and glaucoma were caused by stress working

in EPA offices.

10. Plaintiff became employed at EPA in August 1990.

11. Plaintiff is disabled due to multiple sclerosis, hypertension, optic neuritis and glaucoma. Plaintiff's conditions cause her problems with breathing, walking, flexibility on the left side of her body, dizziness, balance problems and rapid heart beat. These problems affect the major life activities of breathing, walking, seeing, and working. EPA recognized plaintiff's disability by allowing her to work at home beginning in 2000. Plaintiff has a record of being disabled since 1996, including medical documentation, management acknowledgment, and management approval of plaintiff working at her home. Plaintiff has informed her supervisors of her disability, both orally and in writing.

12. In 1998, plaintiff filed two suits in the District Court for the District of Columbia alleging race, color, sex, and disability discrimination and retaliation in connection with her employment at EPA. *Coleman-Adebayo v. Browner*, Civil Action No. 98-CV-926-CKK, filed April 14, 1998; *Coleman-Adebayo v. Browner*, Civil Action No. 98-CV-1939-CKK, filed August 5, 1998. The first suit included allegations of failure to provide a fair performance evaluation, denial of awards and a bonus because of plaintiff's race, color and sex, and subjecting plaintiff to a racially and sexually hostile work environment. The second suit alleged that plaintiff was retaliated against for her prior complaint of discrimination, that she was discriminated against on the basis of disability in that she was not provided reasonable accommodation, that the race, sex and disability

discrimination created a hostile work environment, and that she was removed as the South Africa Program Officer and denied a promised Inter-governmental Personnel Act assignment because of race, sex and disability discrimination. The cases were consolidated.

13. On August 18, 2000, the two cases were tried before a jury. The jury determined that plaintiff suffered race, color and sex discrimination and awarded plaintiff $600,000 in compensatory damages. In addition, the jury determined that plaintiff had not faced retaliation after bringing the discrimination claims and that plaintiff had not been subjected to discrimination on account of her disability.

14. The parties then filed pleadings seeking to limit or expand the ultimate relief granted.

15. EPA retaliated against plaintiff before trial (involving incidents not in the consolidated cases), while awaiting the Court's rulings on relief, and subsequent to the rulings, because of her filing EEO complaints, her winning the consolidated suits, her leadership on behalf of EPA victims of racial discrimination, her meetings with Congressional staff members, her testifying at a Congressional hearing on the employment problems at EPA, and her leadership in the passage of the Notification of Federal Employees Anti-Discrimination and Retaliation Act of 2002. The retaliation included denying administrative leave for plaintiff to prepare for her trial, placing plaintiff on a 120-day detail in which plaintiff was required to conduct research outside of her area of expertise, extending plaintiff's detail beyond the original period, initiating an ethical investigation concerning plaintiff's participation in the National Summit on Africa, giving plaintiff a letter of reprimand for requesting representation after being told of a reassignment, removing plaintiff from being a team leader, and denying plaintiff reasonable accommodation because of disability despite letters from her cardiologist.

16. EPA's retaliation caused plaintiff to suffer severe health problems. In letters to EPA dated October 30, 2000, November 17, 2000, and December 5, 2000, plaintiff's cardiologist, Dr. Martin S. Kanovsky, explained that plaintiff had elevated blood pressure, that past attempts to control plaintiff's blood pressure with medication had been unsuccessful, and that sustained elevations in blood pressure could increase the risk of stroke, heart attack and renal failure. As a result, plaintiff filed a motion for a temporary restraining order on December 21, 2000, requesting that the Court order EPA to immediately grant plaintiff permission to work at home pursuant to EPA's Medical Flexiplace program. Before the Court ruled on the motion, EPA agreed to allow plaintiff to work at home. Since that time, approximately since January 1, 2001, plaintiff has worked from home.

17. On January 5, 2001, this Court ruled on the relief in the consolidated cases. The Court capped the compensatory damages at $300,000 pursuant to the statutory maximum in 42 U.S.C. 1981a(a)(1), (b)(3), and ordered EPA to promote plaintiff to a GS-15 level retroactive to September 1995, provide plaintiff with full back pay and benefits in accordance with the retroactive promotion, and ensure that plaintiff's current pay and benefits were commensurate with the retroactive promotion.

18. On May 11, 2000, plaintiff applied under the Alternate Work Space Policy ("AWS") to work at home associated with work in her officially assigned work site and twice provided medical documentation to support her application. This policy allows EPA employees to work outside their normal offices, either in special EPA offices or at home, for medical reasons, even though the employee is not recognized by EPA as disabled. Plaintiff's application was denied.

19. The "Final American Federation of Government Employees National Collective

Bargaining Agreement for Flexiplace" defines three types of "Flexiplace" programs which allow employees to work at alternate work stations other than an employee's "official" work station. Even though plaintiff applied for AWS, not Flexiplace, EPA notified plaintiff that she could work at home under "regular" Flexiplace. The memorandum states that the time period for an employee's authorization "may be extended where the eligibility factors and other requirements of this agreement are met. Such extensions will not be unreasonably denied."

20. Plaintiff's direct supervisor is Thomas Murray, Chief, Prevention Analysis Branch, who, in turn, reports to Dr. Allan Abramson, Director of the Pollution Prevention Division. Since being authorized to work at home, plaintiff has received direction solely from Dr. Abramson.

21. EPA has refused to extend plaintiff's Flexiplace authorization in the same manner as other employees. EPA has every 30 to 60 days sent plaintiff a letter or e-mail stating that EPA has decided to extend plaintiff's authorization to work at home for an additional 30 to 60 days. This procedure has caused plaintiff severe stress as the end of each extension gets closer, not knowing whether she will receive an extension or whether she will have to fight to be allowed to continue to work at home. Upon information and belief, other workers who are allowed to work at home are typically given authorization to work at home for periods far longer than 30-60 days.

22. The latest letter extending plaintiff's authorization to work at home extended the time by 120 days. In a letter dated August 7, 2003 (two days before plaintiff's authorization was to expire), Dr. Abramson stated that he was extending the previous ending date of August 9, 2003, for an additional 120 days. That meant that plaintiff is authorized to work at home until at least December 7, 2003.

23. EPA and plaintiff have been involved in mediation discussions on her administrative

claims for approximately 32 months. During the mediation, Bridget C. Shea, Senior Policy Advisor in the EPA Office of Administration and Resources Management, stated that EPA's goal in the mediation was to find a way to force plaintiff to resign from EPA.

24. On October 8, 2003, plaintiff's counsel was told by the mediator that Ms. Shea had notified the mediator that, unless plaintiff made a written demand or counter-offer to EPA's latest settlement proposal, EPA would consider the mediation to be over and EPA would require plaintiff to report to work at an EPA office on November 3, 2003.

25. In a letter to plaintiff dated November 6, 2003, Ms. Shea stated:

> As you are aware, the mediation of your pending Equal Employment Opportunity complaints against the Environmental Protection Agency (EPA) or Agency) which has been ongoing since February, 2001, was completed on November 4, 2003 without a successful resolution.
>
> In light of this fact, you are expected to report to work at the Office of Pollution Prevention and Toxics on December 1, 2003. Work responsibilities and assignments will be provided to you at that time. During the interim period, you will continue in your temporary flexiplace arrangement until November 29, 2003 at which time this arrangement will expire.

26. Ms. Shea's order for plaintiff to report to work at the Office of Pollution Prevention and Toxics on December 1, 2003, was in conflict with Dr. Abramson's extension of plaintiff's authorization to work at home until December 7, 2003. Ms. Shea's order was harassment and retaliation against plaintiff because plaintiff had already been authorized to work at home until December 7, 2003. The letter was in retaliation for plaintiff's pursuit of administrative and legal remedies regarding EPA's employment discrimination and for plaintiff's refusal to accept EPA's mediation offer.

27. Ms. Shea's order was issued without the knowledge of plaintiff's Director. Dr.

Abramson stated, in an e-mail dated November 12, 2003, that he had been unaware of plaintiff being ordered to return to work on December 1, 2003. There could not have been any business reason for the December 1 date if plaintiff's immediate supervisor was unaware of it.

28. Ms. Shea's order for plaintiff to report to work on December 1, 2003, was in direct violation of the procedures of the Flexiplace program. The Final American Federation of Government Employees National Collective Bargaining Agreement for Flexiplace of November 25, 1998, states:

> The Agency may remove an employee from the Flexiplace Program based on the employee's failure to adhere to the requirements specified in the Flexiplace Program Agreement and/or performance or conduct issues or concerns which adversely affect or alter the conditions pertaining to any of the approval criteria in Section VI. When a decision is made to remove an employee from the Flexiplace Program, the employee must be given written notice indicating the reason(s) for removal * **.

Ms. Shea's order gave no reason for why the Flexiplace arrangement was being terminated. EPA has never contended that plaintiff has failed to adhere to any requirements of the Flexiplace Program or that there are any performance or conduct issues or concerns adversely affecting or altering the conditions relating to the approval criteria in Section VI of the Agreement.

29. Ms. Shea's order stated that plaintiff was being ordered to report to work at EPA offices because the mediation "was completed on November 4, 2003, without a successful resolution." There is no reasonable relationship between the end of mediation and the termination of plaintiff's authorization to work at home. Mediation is a voluntary process whose termination should have no negative consequences. Plaintiff is unaware of any document that was issued when she was first authorized to work at home that linked the authorization to work at home to the mediation process. In fact, such linkage seems impossible because plaintiff was authorized to work at home around January 1, 2001, whereas the mediation process did not begin until February 2001. None of the

letters granting or extending plaintiff's authorization under the regular Flexiplace program ever mentioned anything about the mediation process.

30. No business reason has been identified by EPA for requiring plaintiff to stop working at home and return to an EPA headquarters office.

31. EPA has never, since 2000, requested that plaintiff provide medical documentation as to why she must continue to work from home.

32. Prior to sending the November 6 letter, EPA has not provided plaintiff with an opportunity to be heard regarding the reasons why it is essential in order to prevent serious injury to plaintiff's health that she be allowed to continue to work at home.

33. On November 18, 2003, plaintiff's counsel notified Ms. Shea that plaintiff intended to bring suit to prevent EPA from forcing her to return to work in an EPA building despite her medical problems. On November 21, Mr. Murray sent plaintiff a letter reassigning her to a position in the Office of Cooperative Management (OCEM) in EPA headquarters and reiterating that she must report for work on December 1, 2003. Mr. Murray further stated that "[s]hould you not be able to report to work on December 1, 2003, for a medical or other appropriate reason, you must contact Daiva Balkus, Director, OCEM prior to your reporting date to address this matter."

34. The reassignment to OCEM is unlawful. Plaintiff is a member of a union, the American Federation of Government Employees ("AFGE"). EPA is required to consult with AFGE before reassigning any employee to a different position. Upon information and belief, EPA never consulted with AFGE.

35. Plaintiff's medical health would be seriously harmed if she were required to return to work at EPA offices. Her cardiologist, Dr. Kanovsky, stated on December 5, 2000, that plaintiff should be allowed to work at home in order that her blood pressure could be controlled and that

"[m]y strong and repeated medical opinion remains the same that Dr. Coleman-Adebayo['s] work-place should be immediately transferred to her home office once I release her from medical care." Dr. Kanovsky's opinion has not changed. In a letter dated November 19, 2003, Dr. Kanovsky stated, in its entirety:

> I have been treating Mrs. Coleman-Adebayo for hypertension for the last three years. Her hypertension developed while she was employed at the EPA. She is presently on medication for her hypertension and her blood pressure is well controlled. However, at this point she is working at home. While she was working at the EPA offices her blood pressure was very difficult to control. She developed hypertension while working there. Previously we have found that the stress of the working conditions at the EPA have made her blood pressure difficult to control. Her elevated blood pressure initially started at the same time when the stress at her work became intense. Over the last few years I've repeatedly recommended that she not work in the stressful environment at the EPA. We have found that this does elevate her blood pressure significantly. Elevated blood pressure can ultimately lead to renal failure, heart attack or stroke. In view of this I would strongly recommend that she not return to work physically at the EPA.

36. Plaintiffs' opthalmologist, Dr. Deborah Y. Wilson, has stated that plaintiff has glaucoma and that "[w]orking at home has been beneficial for the patient as this is a stress-free environment for her."

37. Plaintiff's blood pressure was approximately 185/120 when she worked in an EPA office. It has been approximately 130/85 since she has worked at home and her medications have been stabilized.

38. Plaintiff has suffered severe harm because of EPA's harassment and retaliation. If she is required to return to work in EPA offices, she will suffer additional serious harm.

CLAIMS

First Claim

Failure To Provide Reasonable Accommodations

39. Section 501(b) of the Rehabilitation Act requires federal agencies to promulgate "an

affirmative action program plan for the hiring, placement, and advancement of individuals with disabilities * * *." 29 U.S.C. 791(b).

40. The regulations of the Equal Employment Opportunity Commission (hereafter "EEOC") provide that the federal government shall "become a model employer of individuals with handicaps." 29 C.F.R. 1614.203(b). They also prohibit federal agencies from "discriminat[ing] against a qualified individual with physical or mental handicaps." 29 C.F.R. 1614.203(b). EPA's regulations provide that "[n]o qualified individual with handicaps shall, on the basis of handicap, be subjected to discrimination in employment under any program or activity conducted by the agency." 40 C.F.R. 12.140.

41. Section 501(b) of the Rehabilitation Act requires that reasonable accommodations be provided to qualified disabled employees. 42 U.S.C. 1981a(2). The EEOC regulations require federal agencies to provide "reasonable accommodation to the known physical or mental limitations of an applicant or employee who is a qualified individual with handicaps unless the agency can demonstrate that the accommodation would impose an undue hardship on the operations of its program." 29 C.F.R. 1614.203(c)(1). EPA's regulations adopt this requirement by providing that "[t]he definitions, requirements, and procedures of section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791), as established by the Equal Employment Opportunity Commission in 29 CFR part 1613, shall apply to employment in federally conducted programs or activities." 40 C.F.R. 12.140.

42. Section 501(g) of the Rehabilitation Act, 29 U.S.C. 791(g), provides that "[t]he standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204

and 12210), as such sections relate to employment." Section 102 of the Americans with Disabilities Act of 1990, 42 U.S.C. 12112, prohibits discrimination against a "qualified individual with a disability" and defines "discriminate" as including "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."

43. Section 505(a)(1)of the Rehabilitation Act, 29 U.S.C. 794(a)(a)(1), provides that the:

> remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16), including the application of sections 706(f) through 706(k) (42 U.S.C. 2000e-5(f) through (k)), shall be available, with respect to any complaint under section 791 of this title, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint. In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy.

Section 717 of the Civil Rights Act of 1964, 42 U.S.C. 2000e-16, requires that "[a]ll personnel actions affecting employees * * * in executive agencies * * * shall be made free from any discrimination based on race, color, religion, sex, or national origin. Section 706(g) (1) of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5(g), provides that "[i]f the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate."

44. Plaintiff has been an individual with a disability under the Rehabilitation Act since 2000. Section 6(20)(B), of the Rehabilitation Act, 29 U.S.C. 705(20)(B), and the EEOC regulations, 29 C.F.R. 1614.203(a)(1), define an "individual with a disability" as any person who:

(I) has a physical or mental impairment which substantially limits one or more of such person's major life activities;

(ii) has a record of such an impairment; or

(iii) is regarded as having such an impairment.

Plaintiff satisfies all three criteria. Plaintiff's medical conditions cause her problems with breathing, walking, flexibility on the left side of her body, dizziness, balance problems, and rapid heart beat. These problems affect the major life activities of breathing, walking, seeing, and working. The federal regulations define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. 1630.2(i). EPA recognized plaintiff's disability allowing her to work at home beginning in 2000. Plaintiff has a record of being disabled since 1996, including medical documentation, management acknowledgment, and management approval of plaintiff working from her home office. Plaintiff has informed her supervisors of her disability, both orally and in writing.

45. Plaintiff is a "qualified" individual with a disability under the Rehabilitation Act. Section 101(8) of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. 12111(8), defines a "qualified individual with a disability" to mean "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." The EEOC regulations, 29 C.F.R. 1614.203(a)(6), define a "qualified individual with a disability" to mean "an individual with handicaps who, with or without reasonable accommodation, can perform the essential functions of the position in question without

endangering the health and safety of the individual or others * * *." Plaintiff was and is capable of fully performing the essential functions of the positions she can perform, as long as she can continue to work at home.

46. As set forth above, EPA has stated that it will no longer allow plaintiff to work at home, which means that EPA will no longer provide plaintiff with reasonable accommodations. EPA's failure to provide plaintiff with reasonable accommodations is a violation of Section 501 and 505(a)(1) of the Rehabilitation Act, 29 C.F.R. 1614.203(c)(1) and 40 C.F.R. 12.140.

47. EPA's failure to accommodate plaintiff will cause plaintiff physical harm, emotional suffering, pain, mental anguish, anxiety, inconvenience, and loss of enjoyment of life.

Second Claim

Retaliation

48. 42 U.S.C. 2000e-16 states that "[a]ll personnel actions affecting employees * * * in executive agencies * * * shall be made free from any discrimination based on race, color, religion, sex, or national origin."

49. 29 U.S.C. 794a(a)(1) states that "[t]he remedies, procedures, and rights set forth in * * * 42 U.S.C. 2000e-16 * * * shall be available, with respect to any complaint under section 501 of [the Rehabilitation Act]."

50. Section 501(b) of the Rehabilitation Act requires federal agencies to promulgate "an affirmative action program plan for the hiring placement, and advancement of individuals with disabilities * * *." 29 U.S.C. 791(b).

51. The Rehabilitation Act directs the federal government to "become a model employer of individuals with handicaps." 29 C.F.R. 1614.203(b). The Act prohibits federal agencies from "discriminat[ing] against a qualified individual with physical or mental handicaps." 29 C.F.R.

1614.203(b).

52. The Rehabilitation Act provides that the standards used to determine whether Section 501 "has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment." 29 U.S.C. 791(g). Section 102 of the Americans with Disabilities Act of 1990, 42 U.S.C. 12112, prohibits discrimination against a "qualified individual with a disability" and defines "discriminate" as including "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."

53. The Rehabilitation Act requires federal agencies to provide "reasonable accommodation to the known physical or mental limitations of an applicant or employee who is a qualified individual with handicaps unless the agency can demonstrate that the accommodation would impose an undue hardship on the operations of its program." 29 C.F.R. 1614.203(c)(1). "Reasonable accommodation may include, but shall not be limited to: (i) Making facilities readily accessible to and usable by individuals with handicaps; and (ii) Job restructuring, * * * acquisition or modification of equipment or devices, * * * and other similar actions." 29 C.F.R. 1614.203(c)(2).

54. 42 U.S.C. 2000e-3(a), states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees * * * because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."

55. 29 C.F.R. 1614.101(a) states that "[i]t is the policy of the Government of the United States to provide equal opportunity in employment for all persons, to prohibit discrimination in employment because of race, color, religion, sex, national origin, age or handicap and to promote the full realization of equal employment opportunity through a continuing affirmative program in each agency." 29 C.F.R. 1614.101(b) states that "[n]o person shall be subject to retaliation for opposing any practice made unlawful by title VII of the Civil Rights Act (title VII) (42 U.S.C. 2000e et seq.), * * * or the Rehabilitation Act (29 U.S.C. 791 et seq.) or for participating in any stage of administrative or judicial proceedings under those statutes."

56. As set forth above, defendant retaliated against plaintiff in violation of Title VII of the Civil Rights Act and the Rehabilitation Act.

57. Defendant's actions caused plaintiff emotional suffering, pain, mental anguish, anxiety, inconvenience, and loss of enjoyment of life.

RELIEF

Wherefore, plaintiff respectfully requests that the Court:

1. Order defendant to recognize plaintiff as disabled within the meaning of the Rehabilitation Act.

2. Order defendant to provide reasonable accommodations to plaintiff as a disabled person, including work at home.

3. Enjoin defendant from discriminating against plaintiff on the basis of her race, color, sex and/or disability and from retaliating against her because she filed and prosecuted this civil action or other civil actions or administrative claims;

4. Award compensatory damages, including, but not limited to, medical costs, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, inconvenience, loss of

reputation and other nonpecuniary costs;

5. Award attorneys' fees and other costs, including expert witness' fees;

6. Order such other relief as may be deemed equitable and proper.

Respectfully submitted,

BRUCE J. TERRIS (D.C. Bar No. 47126)
MICHAEL G. SHAW (D.C. Bar No. 473088)
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC 20005-4632
(202) 682-2100 (tel)
(202) 289-6795 (fax)

Attorneys for Plaintiff

November 24, 2003